IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | NO. 16-400 |
| | : | |
| RAHEEM SLONE | : | |

## MEMORANDUM WITH
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**KEARNEY, J.**                                                                                              **March 17, 2017**

Following study of the Raheem Slone's Motion to suppress evidence of a gun holster found on him on February 13, 2016, the United States' Opposition, evaluating the credibility of officers' testimony and exhibits during our March 10, 2017 suppression hearing, and post-hearing memoranda, we deny Mr. Slone's Motion to suppress. We find the police officers credibly described reasonable suspicion of criminal conduct causing them to stop Defendant after a specifically described but anonymous citizen described him moments earlier as having a gun in a high crime area and then watching him walk away from the patrol vehicle, kneel down and stash an object taken from his right waistband into a sewer immediately below him. The officers found the gun holster on his body while securing and handcuffing him before placing him in the patrol vehicle.

### I.    Findings of fact

1.     The Philadelphia Police Department employs Michael Hanuscin and Jason Metzger as police officers.

2.     Officer Hanuscin served approximately 8 years as a patrol officer in the 24th

Police District as of February 13, 2016.

3. Officer Metzger served approximately 2 years as a patrol officer on the 24th District as of February 13, 2016.

4. The police department assigned Officers Hanuscin and Metzger to work as patrol partners in the Kensington section of the 24th Police District as of February 13, 2016.

5. On February 13, 2016, Officers Hanuscin and Metzger were on a routine patrol in the area of 1800 East Somerset Street in Philadelphia, Pennsylvania.

6. The Officers testified they know this area as a high crime area with open air drug sales, gun violence, and violent crime.

7. Routine Patrol means the officers travel in a marked police cruiser wearing their Philadelphia Police Department uniforms.

8. On this February 13, 2016 night, Officer Metzger drove the patrol car and Officer Hanuscin sat in the front passenger seat.

9. Officer Metzger testified they were stopped at a red light at the intersection of Kensington Avenue, Somerset Street and D Street in their police cruiser at 12:20 A.M.

10. The Officers were in the southbound lane of Kensington Avenue.

11. At the intersection, a thin African-American woman unknown to the Officers exited a bar door to the Officers' right and approached the passenger side window of the marked police cruiser. This unidentified woman stated "he's got a gun" to Officer Hanuscin in front of other bystanders on the street.

12. Officer Hanuscin observed the woman pointing and nodding with her head towards a man, later identified during our suppression hearing as Raheem Slone, walking across Kensington Avenue on Somerset Street.

13. Officer Hanuscin testified the thin African-American woman appeared frightened to him. Officer Metzger, in the driver's seat, could not describe the woman.

14. Officer Hanuscin observed Mr. Slone look at the police cruiser.

15. Officer Metzger testified he made a left onto Somerset Street where Mr. Slone walked.

16. Officer Hanuscin then observed Mr. Slone cross to the north side of 1800 East Somerset Street. Mr. Slone began walking briskly towards the corner of Ruth and Somerset Streets, approximately 100 yards away.

17. Officer Hanuscin observed Mr. Slone look at their police cruiser several times while walking away.

18. While we have no evidence of exact time, Officers Hanuscin and Metzger radioed for police backup.

19. When approximately to the corner of Ruth and Somerset Streets, Officers Hanuscin and Metzger observed Mr. Slone remove an object from his right side front waistband with his right hand.

20. Officer Hanuscin testified he saw Mr. Slone kneel down and stash the object into the water run-off sewer on a corner of the intersection of Ruth and Somerset Streets.

21. Approaching the intersection, Officer Metzger turned the police car to a 45 degree angle to allow his headlights to enlighten the area surrounding Mr. Slone.

22. Officers Hanuscin and Metzger then exited their police cruiser and approached Mr. Slone.

23. Officer Metzger testified Mr. Slone took 2-3 steps back from the sewer and the Officers.

24. Both Officers testified they ordered Mr. Slone to show them his hands several times.

25. Mr. Slone did not comply with their commands and the Officer Metzger testified he believed Mr. Slone was about to run north on Ruth Street.

26. Officer Metzger testified he re-holstered his gun once he saw both Mr. Slone's hands and confirmed he did not have a weapon.

27. Officer Hanuscin testified he re-holstered his gun once he was close enough to physically apprehend Mr. Slone.

28. Officer Hanuscin reached out and grabbed Mr. Slone's right hand and then briefly struggled with him.

29. Officer Hanuscin took Mr. Slone to the ground where he handcuffed him.

30. While handcuffing Mr. Slone, Officer Hanuscin observed a brown leather gun holster around his waistband.

31. The Officers placed Mr. Slone in the police car.

32. The Officers then pried the metal sewer cover off and used a flashlight to look into the sewer where Mr. Slone had discarded the object.

33. The Officer saw a gun and with the assistance of other officers recovered a Rossi .38 caliber revolver.

34. On September 27, 2016, a grand jury indicted Mr. Slone for violating 18 U.S.C. § 922(g)(1) and 924(e), possession of a firearm by a convicted felon.

35. Mr. Slone now moves to suppress the brown leather gun holster.

## II. Conclusions of law

36. Under the totality of the circumstances, Officers Hanuscin and Metzger articulated specific reasons for suspecting Mr. Slone engaged in criminal activity and to stop and frisk him.

37. Officers Hanuscin and Metzger's use of reasonable force did not convert their *Terry* stop of Mr. Slone into a custodial arrest.

## III. Analysis

Officers Hanuscin and Metzger had reasonable suspicion to stop Mr. Slone. Their use of reasonable force did not rise to the level of custodial arrest under the totality of the circumstances. Even if their use of force created a custodial arrest, the officer demonstrated probable cause.

### A. The officers had reasonable suspicion to stop Mr. Slone.

The Fourth Amendment protects citizens from warrantless searches and seizures by the government. A police officer may, without a warrant, "conduct a brief investigatory stop when the officer has a reasonable, articulable suspicion standard that criminal activity is afoot."[1] The test we apply in reviewing a *Terry* stop "is one of reasonableness given the totality of the circumstances, which can include [the defendant's] location, a history of crime in the area, [the defendant's] nervous behavior and evasiveness, and [the officers'] 'commonsense judgments and inferences about human behavior.'"[2] We "allow[] officers to draw on their experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."[3]

Officers Hanuscin and Metzger credibly testified they were on routine patrol. They knew this area constituted a high crime area with gun violence. Each officer had experience in this

area. The Officers arrived at the intersection of Kensington and Somerset Avenues at 12:20 A.M. where a thin African American woman exited a bar door and said "he has a gun" to them and pointed and nodded at Mr. Slone. Officer Hanuscin saw Mr. Slone look in the direction of their police cruiser and begin to walk away. The Officers saw Mr. Slone remove an object from his waistband and stash it down a sewer. Mr. Slone then refused to comply with the Officers' orders to stop and put his hands up.

Under the totality of the circumstances, the Officers had reasonable suspicion because a woman described as a thin and African American directly identified Mr. Slone as having a gun when the Officers happened upon the intersection and their suspicion was enhanced by Mr. Slone's behavior in walking away from the police cruiser, discarding an object from his waistband into a sewer, and failing to comply with their commands.

Mr. Slone argues the *Terry* stop violates his Fourth Amendment rights because the Officers cannot base their reasonable suspicion on a "mere anonymous tip."[4] In *United States v. Valentine*, two officers patrolled a "very bad" neighborhood at 1:00 A.M. when a young man "flagged them down" explaining he had just seen a man with a gun.[5] The informant described the man but refused to identify himself to the officers.[6] The officers searched and shortly after, found a man, the defendant, matching the informant's description.[7] When the officers went to stop him, the defendant tried to run past the officers and the officer grabbed him.[8] During the scuffle between the officer and the defendant, the defendant's gun fell out and hit the ground.[9] Defendant moved to suppress the gun and the district court granted his motion holding the officers did not have reasonable suspicion based on anonymous tip and the officers cannot base reasonable suspicion on the defendant's conduct after the officers order him to stop.[10]

Our Court of Appeals held the officers had reasonable suspicion to conduct a *Terry* stop

6

of the defendant based on the informant's tip because the informant told the officers he saw the defendant seconds ago and we give great weight when "the victim of a street crime seeks immediate police aid and gives a description of the assailant."[11] Officers assess credibility of tips on the totality of the circumstances and the fact "the informant was exposed to retaliation from [defendant] and knew that the officers could quickly confirm or disconfirm the tip; and the officers could assess the informant's credibility as he spoke, knew what the informant looked like, and had some opportunity to find the informant if the tip did not pan out."[12]

Officers Hanuscin and Metzger had more reason to credit this woman's "tip" than the officers expressed in *Valentine* because the thin African American woman pointed directly to Mr. Slone when telling the officers he had a gun. Under the totality of the circumstances, the woman is exposed to possible retaliation from Mr. Slone because she identifies him to the officers in front of him, the officers could quickly confirm her tip because they could see Mr. Slone, and the officers could locate her if she lied.[13] We agree with our Court of Appeals "given the large number of potential crimes and dangers posed by an armed criminal, we think that if the police officers had done nothing and continued on their way after receiving the informant's tip, the officers would have been remiss."[14]

Our Court of Appeals acknowledged "even if police officers have a reliable tip saying that someone is carrying a gun, that information alone will not provide enough evidence to support a *Terry* stop."[15] The defendant's behavior and context must be taken in account to confirm reasonable suspicion.[16] In *Valentine*, the defendant and his companions began walking away when they saw the police cruiser.[17] "In summary, we conclude that the officers had reasonable suspicion after they received a face-to-face tip, were in a high crime area at 1:00 A.M., and saw [defendant] and his two companions walk away as they noticed the police car."[18]

7

Officer Metzger credibly testified Mr. Slone looked in their direction and began walking away briskly while looking back at them in a high crime area at 12:20 A.M. The Officers had reasonable suspicion to follow him when they witnessed Mr. Slone take an object from his waistband and stash it into a sewer. Mr. Slone also failed to comply with the Officers' orders and did not comply until the Officers used physical force. Under the totality of the circumstances, the Officers had reasonable suspicion to conduct a *Terry* stop based on the woman's report and Mr. Slone's evasive behavior.[19]

### B. The Officers' use of reasonable force did not rise to a custodial arrest.

The Officers had reasonable suspicion Mr. Slone had a gun when they exited their police cruiser and their use of reasonable force to protect their safety when approaching Mr. Slone does not amount to a custodial arrest.

The Officers "are allowed to use a reasonable amount of force" during a valid *Terry* stop.[20] "There is no *per se* rule that pointing guns at people, or handcuffing them, constitutes an arrest."[21] In *Fields*, two officers were on routine patrol in a marked police cruiser in a high-crime area.[22] The officers observed the defendant leaving an abandoned house and the officers were aware of neighbors' complaints about drug dealing there.[23] The officers got out of their police cruiser and followed the defendant.[24] The officers testified when the defendant saw them following him, he began to run away.[25] The defendant tripped and fell facedown and the officers observed the defendant "kept his hands beneath the lower portion of his body and refused to show them."[26] The officers feared he had a gun and unsuccessfully tried to pull the defendant's hands from under his body.[27] One of the officers then used his taser twice to subdue the defendant and they handcuffed and frisked him.[28] The officers then returned to the area where the defendant fell and found a gun.[29]

8

The defendant moved to the suppress the gun arguing the officers' use of force elevated his detention to a custodial arrest and the officers did not have probable cause.[30] The defendant also argued the inevitable discovery doctrine does not permit the constitutional seizure of his gun.[31] The district court denied his motion to suppress and our Court of Appeals affirmed.[32] Our Court of Appeals held "[u]se of physical force after less aggressive means were unsuccessful does not elevate the stop into an arrest."[33] "[Defendant] did not yield to the show of authority and created an environment where the Officers felt threatened; therefore, the use of physical force was reasonable under the objective reasonableness standard" and did not become an arrest.[34] Our Court of Appeals also held the inevitable discovery doctrine applied because the officers had reasonable suspicion to conduct a *Terry* stop and frisk and would have discovered the gun had the defendant complied with their orders.[35]

Officers Hanuscin and Metzger believed Mr. Slone had a gun when they approached him at the corner of Ruth and Somerset Streets to conduct a *Terry* stop. To protect their safety, both Officers testified they had their guns drawn when they approached Mr. Slone and they ordered Mr. Slone to show his hands. Both Officers testified Mr. Slone failed to comply with their orders. Officer Hanuscin testified he re-holstered his gun once he was close enough to physically apprehend Mr. Slone and Officer Metzger testified he re-holstered his gun once he saw both of Mr. Slone's hands did not hold a gun. Officer Hanuscin then grabbed Mr. Slone's hand and physically took him to the ground during a struggle and handcuffed him. During this process, Officer Hanuscin observed a holster around Mr. Slone's waist.

In *Fields*, our Court of Appeals found the officers held an objectively reasonable fear the defendant had a gun from the way he held his hands under his body and his flight from the officers. In addition to Mr. Slone's failure to "yield to the show of authority and [his] creat[ion

9

of] an environment where the Officers felt threatened," Officers Hanuscin and Metzger had been informed Mr. Slone had a gun.[36] The Officers' display of guns and use of physical force to detain Mr. Slone while ensuring their safety is objectively reasonable and does not convert their *Terry* stop into a custodial arrest.[37] The Officers also had a reasonable belief Mr. Slone had put his gun in the sewer after they saw him kneel down and stash an object into the sewer and only found a holster when they handcuffed and frisked him. The Officers cannot assume Mr. Slone no longer had a gun because he stashed an object into the sewer. It is objectively reasonable for officer and public safety for the Officers to place Mr. Slone in their car while locating the object placed in the sewer.

### C. Assuming there is a custodial arrest, the Officers had probable cause.

Even if the Officers' conduct amounted to a custodial arrest, we find the Officers had probable cause. "Probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested."[38] "Under Pennsylvania law, a police officer had probable cause to arrest an individual for a violation of [18 Pa. Cons. Stat. § 6108] based solely on the officer's observation that the individual is in possession of a firearm on the streets of Philadelphia."[39] The officers do not need to ascertain whether the individual with the gun has a valid permit because "[t]he possession of a license is an affirmative defense..."[40]

Officers Hanucsin and Metzger had sufficient facts and circumstances to believe Mr. Slone carried an illegal gun when they exited their police cruiser with their guns drawn. A frightened thin African-American woman told Officer Hanuscin Mr. Slone had a gun. When the Officers turned their vehicle to follow Mr. Slone, he crossed the street, began briskly walking,

10

and glanced over his shoulder to look at them. The Officers then witnessed Mr. Slone remove an object from his waistband, kneel down and stash the object into a sewer directly below him. The Officers had probable cause to believe Mr. Slone carried a gun on the streets of Philadelphia and either discarded the gun, or other contraband, into the sewer to avoid the Officers discovering it.

Mr. Slone argues some citizens of Philadelphia can validly possess a gun on the streets. The argument fails for two reasons. First, Pennsylvania law holds an officer's observation a person is carrying a gun on the streets of Philadelphia is *per se* probable cause and valid possession is an affirmative defense.[41] While the Officers did not see Mr. Slone's gun, they believed he carried one based on the woman's tip while frightened and his conduct. Second, the Officers' testimony describing Mr. Slone's conduct does not evidence an individual lawfully possessing a gun permit. Mr. Slone attempted to get away from the police cruiser and then removed an object from his waistband, kneel down and stash it in a sewer immediately below him. We find the Officers had probable cause because these "facts and circumstances" are "sufficient in themselves to warrant a reasonable person" to believe Mr. Slone carried a gun.[42]

### IV. Conclusion

In the accompanying Order and based upon our evaluation of, and finding Officers' testimony to be credible, we deny Mr. Slone's motion to suppress because Officers Hanuscin and Metzger had reasonable suspicion under the totality of the circumstances to conduct a *Terry* stop of Mr. Slone. The Officers' use of reasonable force did not convert their *Terry* stop of Mr. Slone into a custodial arrest. Even if the exercise of force constituted a custodial stop, the Officers demonstrated probable cause.

---

[1] *Terry v. Ohio*, 392 U.S. 1, 30 (1968).

---

[2] *Johnson v. Campbell*, 332 F.3d 199, 206 (3d Cir. 2003) (*quoting Illinois v. Wardlow*, 528 U.S. 119, 124-25 (2000)).

[3] *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

[4] ECF Doc. No. 17 at 6.

[5] 232 F.3d 350, 352 (3d Cir. 2000).

[6] *Id.* at 352-353.

[7] *Id.* at 353.

[8] *Id.*

[9] *Id.*

[10] *Id.* at 352.

[11] *Id.* at 354 (quoting *Adams v. Williams*, 407 U.S. 143, 146 (1972)).

[12] *Id.* at 355.

[13] *See id.* at 355.

[14] *Id.* at 356.

[15] *Id.* at 355.

[16] *Id.* (distinguishing from *United States v. Ubiles*, 224 F.3d 213 (3d Cir. 2000) where only a tip from an unknown man the defendant had a gun during a street celebration without any suspicious conduct on the defendant's part is not enough for reasonable suspicion under *Terry*).

[17] *Id.* at 357.

[18] *Id.*

[19] *See id.* at 357.

[20] *United States v. Bonner*, 363 F.3d 213, 217 (3d Cir. 2004) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

[21] *United States v. Burney*, 35 Fed. Appx. 354, 355 (3d Cir. 2002) (quoting *Baker v. Monroe Township*, 50 F.3d 1186, 1193 (3d Cir. 1995)).

[22] *United States v. Fields*, 449 Fed. Appx. 146, 147 (3d Cir. 2011)

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *Id.* at 149.

[33] *Id.* at 148 (citing *Grahan*, 490 U.S. at 396).

[34] *Id.* at 149.

[35] *Id.*

[36] *Id.*

[37] *See id.*

[38] *Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000) (internal citations omitted).

[39] *United States v. Edwards*, No. 11-3156, 2012 WL 3046238, at *4 (E.D. Pa. July 26, 2012) (quoting *United States v. Bond*, 173 Fed. Appx. 144, 146 (3d Cir. 2006)).

[40] *Bond*, 173 Fed. Appx. at 146.

[41] *See Bond*, 173 Fed. Appx. at 146.

[42] *See Wilson*, 212 F.3d at 789.